George Clark of Keith and Laura Tucker, may it please the court. Is Title 26, the tax code, a little world of its own in the U.S. Code? A world where the only point of entry is a test defined and measured by the federal courts without regard to the words used by Congress in defining that little world? Or do those words matter? Do we get to look to statutory text to decide whether and to what extent Congress actually intended for a substance or economic type test to apply? Only that latter view of the economic substance doctrine admits for the proper role of the federal courts and is also consistent with basic principles of statutory construction we see everywhere else in the U.S. Code. And that's the view that this court should take in deciding Mr. Tucker's case. The economic substance doctrine, whatever it may mean, cannot mean that in every circumstance, the IRS and the courts can simply override the plain language of the Code because they don't like the results worked by that plain language. Now it is true, undeniably true, that most of the provisions of the tax code implicitly require a transaction to have certain levels of economics. And whenever that is the case, taxpayers have to do more than just comply with the plain language of the Code. They have to step through those additional tests. There are some provisions, though, that don't require economics. Some of those provisions, in fact, disregard economics. And they either capture or reject all transactions that fall within the scope of their language. Now that reality is actually reflected in Congress's codification of the economic substance doctrine. Now again, the codification of economic substance doctrine is not applicable to this case. I raise it as illustrative. The government has raised it. The codification says that the economic substance doctrine will only be applied, or will be applied to, quote, any transaction to which the economic substance doctrine is relevant. That implies that there are transactions in the Code to which the economic substance doctrine is not relevant. How do you determine that? How do you determine that in this little world? Well, you have to get inside that little world. You have to look at the Code. You have to look at the words that Congress used. So the Court has to take into account those actual words. And let's talk about some of those actual words. Section 988. Foreign currency contracts are governed by 988. Foreign currency contracts are complicated. They're intertwined. You can have a put, you can have a call, you can have a sale, you can have a purchase that all of us might look at from an economic perspective and say those cancel each other out, okay? Economically, they cancel each other out. Congress specifically ignored those economics when it wrote 988. It deemed foreign currency transactions to be stand-alone. It literally said that losses and gains will be computed separately, okay? Because the rule itself, not something that Mr. Tucker did, but the rule itself ignores economics, economics can't override that rule. The 30-day rule is similar. The 30-day rule literally said, it's gone now, but the 30-day rule literally said if there's income or loss within this 30-day period, we ignore it. It could be a billion dollars. It could be $1. It could be a billion-dollar loss. It doesn't matter. We ignore it for tax purposes. So you can't have an economic substance doctrine that overrides a rule like that, a 30-day rule. The check-the-box election is another good example. Check-the-box election rules literally allow taxpayers to choose do I want the benefits and detriments of a company or do I not want the benefits and detriments of a company? That election specifically allows taxpayers to override corporate realities. Now, in such a circumstance, barring malpractice, those elections will always be made in ways that are taxpayer-favorable, okay? Those rules are, as the Sixth Circuit said at SUMA, all form and no substance. So tax avoidance motive, economics, substance, things like that cannot override those sorts of elections. The 367 election is similar. When the 367 election was in existence, it's no longer there, it literally said there are two gains, two gains. Taxpayer, you pick. So it doesn't matter whether it's the big one. You could pick the big one if you wanted to, but you can pick the little one. That's literally what the election said. You can't have an economic rule that goes in and overrides that taxpayer election. So it's also, I think, important for the Court to understand, as it looks at this case, that the rules at issue here have been changed by Congress and the Treasury Department. Issues were raised with those. Some of those issues were actually known. The 367 rule, there was a... The Treasury Department knew that they had an issue with that rule when they enacted it. They didn't fix it. They kept it in existence for another year that let Mr. Tucker use it. But those rules have been removed. So how do we look at this case? Under the Federal Circuit's decision in Coltec, which largely has been adopted by most circuits and certainly cited favorably by this Court, the transaction to be analyzed is the one that gives rise to the tax benefit. That's what we look at. The core of Mr. Tucker's transaction, the part that gives rise to the benefit, was a sale of lost property. Now, in some cases, but not in this case, there's a question about whether something was actually sold, whether the benefits and burdens of ownership transferred it, whether somebody retained an interest in it. And in those circumstances, you would look at whether there's actually a sale. There's no question here about whether there was a sale. There's no question that, in fact, Mr. Tucker parted with these options and they were bought by Lehman Brothers. There's no question about that. So the question here, like in Coltec, really, is what's the basis? What are the transactions that give rise to the basis that Mr. Tucker had in this property? Now, the detailed and mechanical rules that I just went through result in Mr. Tucker's investment having two pieces of property. They're actually sub-properties, but if you'll forgive me, generally two pieces of property, a piece of property that has gain in it and a piece of property that has loss in it. Now, gain is simply tax basis, you know, less than value, and loss is simply tax basis in excess of value. The Code literally taxed the loss. It let the loss come in to Mr. Tucker's return, and it specifically excluded the gain. Now, that does not mean that the loss can be overridden by somehow putting these two together. Again, 988 says the two are separate. 988 separates those two transactions. Nor does it make it artificial for the Court, or Mr. Tucker, to recognize the loss leg. They literally have two transactions, two sets of investments. One has loss, one has gain, one is recognized for the Code, and one isn't. Congress directed that treatment in 988. In those circumstances, math is what determines the loss. It's not economics. And are we really to believe, if we work through this and think about, well, what would have happened if the two transactions had been flipped, if the gain had been treated, had been recognized after? You're saying math determines the loss and not economics? In that circumstance. Tell me what the difference is. Well, math is simply just taking, you know, x minus y equals z. That's math. Economics, at least the way the economic substance doctrine has been applied sometimes, is we have to look to see what the profit potential was on any given circumstance, and how do we look at that from what the taxpayer's motive was? That's what I mean by economics. And the profit potential here was low on these... It was low, Your Honor. It was $500,000, which to me isn't low, but to the tax court, that was low relative to the rest of the transaction. Now, I think it is important, though, while we're on that point, Your Honor, to understand the case, there's a lot of this discussion about the abusiveness of this case, okay? This case, in the year that's before the court, if the court were to overrule the tax court, would result in Mr. Tucker getting $2,000 loss because he had $2,000 worth of... $2 million loss, sorry, because he had $2 million worth of basis in Sligo. It's a dollar for dollar. He gets a dollar of loss for a dollar of basis. And in future years, he's only going to get basis to the extent he contributed additional property to Sligo. That is not an... Just from a tax perspective, that's not an abusive transaction. Typically, you get loss for basis. But the amount of profit in this case was about $500,000. But to deal with these things, economics is not really the answer. The law, when it talks about tax losses, it doesn't say, well, what's your economic loss? It says, what's your tax loss? And those two things can be separate. If you look at cottage savings, in cottage savings, the savings alone, cottage savings had property. It sold that property for tax purposes. It recognized a loss for tax purposes, but it didn't have a loss for accounting purposes. It didn't have a loss for economics purposes. But the Supreme Court said, well, it had a tax loss. And that's what I mean by math. Basis is calculated through these rules, and it says what the loss is. And again, in Mr. Tucker's context, and this is important to understand, he had a gain transaction and he had a loss transaction. The code just didn't tax the gain. And it's not for this Court to try to put those two things back together. It's also, and there's a lot of this in the government's argument, that the timing somehow shows that there's something wrong with this transaction. Many taxpayers sell property at the end of the year specifically to recognize tax losses. That is normal garden variety tax planning. You don't disregard those transactions because they happen at the end of the year. I mean, this Court in Compact said, even assuming that a taxpayer sought primarily to get otherwise unavailable tax benefits in order to offset unrelated tax liabilities and unrelated capital gains that need not invalidate the transaction. That's the same thing here. And I think a good case to look at for that is Granite Trust. Granite Trust involved two code provisions, okay? One that resulted in a deductible loss for the taxpayer and one that didn't. And the taxpayer planned into that, specifically entered into transactions so that they got the percentage ownership that they had in the company right to the level that they needed to. And the Court said that's fine to do that. Whenever you have a bright-line test like that, you have to assume that Congress understands that taxpayers are going to plan around that bright line if they're well-advised. So, again, we talked a little bit about this before Judge Graves about the, you know, the $500,000. Mr. Tucker, the Court found that Mr. Tucker had about a 40 percent chance, roundabout, maybe a little bit less than that. Well, I mean, you say 40. The estimate was 40 was a high estimate. High end of the estimate. But the government never really connected on their expert saying that the match between the two sets of options should be less than that. So the Court basically said it probably is less than that, but there's no finding that it's less than that, Your Honor. So I think, let's say, around about 40 percent, that's why I said around about 40 percent, at, you know, $500,000, the Court found that even the experts, you know, were in agreement on that profit potential, our expert and the government's expert. So why wasn't that enough? The Court held that that wasn't enough because of its erroneous view of the law. And it viewed the... I think it works the way I said, like this little world. They said, we have to actually analyze Mr. Tucker's transaction abstractly, not looking at the actual code provisions at issue, just out here, outside of the little world of the tax law, and determine first whether it has economic substance. That's not right. As the provisions applicable, as to the provisions that are applicable here, as long as the transactions actually happen, and there's no question that these transactions actually happen. They're not shams in fact, okay? He actually did these transactions. The Court didn't find that they were shams, in fact. As the Sixth Circuit said in Summa, a tax avoidance motive alone cannot nullify an otherwise code-compliant and substantive set of transactions. And as said years before in Fabrica, the brightness of the motive cannot be permitted to blind our eyes to the existence of substantive events. So the same thing is true here. Mr. Tucker's transactions actually happened. They were real. And the law in effect at that time set out the results of those transactions without regard to economics. Therefore, they have to be respected. I would also again say this is not an abusive transaction. This is a transaction where Mr. Tucker — there was a part of this transaction that was abusive. And Mr. Tucker, having found out that KPMG sold him that part of the transaction, litigated the issue with KPMG and conceded that part of the transaction. What we're dealing with now is the rest of the transaction, which is simply a dollar of loss for a dollar of basis. And in closing, Your Honors, I would say that the tax laws are perhaps the most complicated and detailed set of laws on our books. There might be another one. I can't think of it. There's great benefit to taxpayers and the government if those laws are certain in their application. And provisions that impose bright-line rules that give taxpayers favorable elections, that actually override economic results, should not be redrawn by the courts based on notions of economics or substance. Instead, in those circumstances, as long as the transactions to which the provisions actually apply, you know, to which those provisions apply, are actually real and really happen, the law should be, you know, applied as Congress chose to write it, unless the Court has further questions on it. Thank you, counsel. Thank you. Good morning. May it please the Court. Ellen DelSalle from the Department of Justice for the Commissioner. This case is a textbook example of the Economic Substance Doctrine's proper application, and binding precedent of this Court and the Supreme Court recognizes that doctrine. And here, the evidence and the case law really overwhelmingly supports the finding below that this transaction lacked economic substance under each prong of this Court's test that was laid out in the Klamath case. And that case recognizes that any one prong would be enough, but we think the tax court really has presented a very strong opinion holding that each of those prongs were met here. Mr. Tucker set up this transaction after he found out he was going to have this big $40 million chunk of income from his exercise of stock options. He went looking for a tax shelter, and the record plainly shows that here. And he entered into this transaction where he claimed an artificial $52 million tax loss. He didn't really suffer that economically because he had this offsetting gain leg that he, through this very contrived transaction, tried to keep out of the United States, and this loss came into the United States. And he suffered — he admitted at trial at page 8605 of the record that he only suffered a $695,000 economic loss, nothing compared to the actual loss that he claimed. And this is exactly the kind of wash transaction where a loss is claimed, but what really happens is no significant economic change in position that the economic substance doctrine was designed to address. And the Supreme Court's opinion in Frank Lyon I think very coherently explains that the tax provisions that allow certain elections and create deductions and credits under the code are designed to deal with real business transactions, not transactions that are designed just to create a tax loss like this one was. And I think if the expert report in taxpayers' arbitration with KPMG, which talks about this transaction at page 6066 of the record and which taxpayer swore was true in a declaration at page 6099 of the record, really says it best. It explains that these were offsetting transactions — offsetting options that were structured to minimize risk. And it goes on to say, the only residual opportunity for gain and risk of loss were built into the transaction in an effort to sustain the intended tax benefits by showing economic substance. The investments were not related to Mr. Tucker's general investment needs or to his personal or business situation. Their nature and timing were dictated by the perceived tax requirements. And I think that really makes clear that this was a planned transaction for tax benefits that had no business purpose and was really the minimal profit potential and loss potential was what's been called a narrow collar in many of the cases similarly addressing offsetting options that was just designed as window dressing that was minimal compared to the tax benefits that were going to be claimed. And I think the taxpayer's suggestion that what's being — what's at issue here is only $2 million and that the 65 — you know, the potential profit of 500,000 and the actual loss of 695,000 is significant comparison really hides the ball here because what happened here were two sets of almost identical kind of schemes involving using offsetting options and then splitting the gains of loss using very technical — a very technical timing scheme. And he's conceded that part of it was intended to inflate basis so that he could take the whole loss and the other part was intended to generate the loss. But when you — the fact that he conceded the basis shouldn't make the other part of the scheme suddenly a viable economic transaction. It had the same tax avoidance motive and it was designed in essentially the same way. And I think — and he's still trying to claim, as the tax court pointed out, the whole transaction because he claims he can carry forward the rest to future years and, in fact, there's a case pending that's now stayed in the Court of Federal Claims involving his 2001 tax year. So certainly there — we're not just talking about the $2 million that's still at issue in this case. I think in trying to divert the Court from its test in Klamath, which I think the tax court very well lays out as met here, the taxpayers suggest that literally complying with the Code should make the economic substance doctrine not come into play. And this Court recognized in the Southgate case that literal compliance with the Code doesn't preclude the economic substance doctrine to comply. And we lay out in 15 of our brief some real questions about whether this transaction is permissible under the Code, which the tax court didn't reach, things like Section 165, which limits losses to bona fide losses from transactions entered into for profit. And we would read Section 988 differently than my opponent would as actually precluding the separation of these options. But the Court doesn't have to get to that, as the tax court didn't, because this is such a clear case of lack of economic substance. And literal compliance with the Code doesn't preclude that from applying. When you go through the test in Klamath, I think this really is a very clear case of lack of economic substance. The objective inquiry looks at whether the loss claimed is real. And as I've discussed, this loss here, this $52 million loss he claimed, was artificial. Additionally, the narrow window for profit or loss is compared to the claim loss. And when it's minimal, the courts have recognized that it's just window dressing to try to save the transaction. And I think as in Sala, where there was a $500,000 potential profit and a $20 million claim tax benefit, and the Court applied the economic substance doctrine, the same reasoning applies here. And this Court's Nevada Partners case is the same, and the Federal Circuit's Stobie Creek and Jade trading cases are all in that same vein of addressing similar offsetting options situations and looking at this narrow little window that was preserved for loss and risk and comparing it to the tax benefits and saying that doesn't give the transaction economic substance. And I think the expert reports also, Dr. DeRosa's report very credibly explains that with these options that the taxpayer, more likely than not, wouldn't prevail on, and a situation where to make a profit, he had to win on all his bets, that was really something very unlikely to happen. And so even the minimum $487,000 profit that the experts agreed was the most that could happen here was a very remote possibility, so remote that Dr. DeRosa considered that transaction to have a negative rate of return. So I think the objective test under Clematis is more than met here, and the subjective test is also met, which gives an alternate ground for affirmance here. The subjective test look at the two prongs that the Court sort of indicated in Southgate are very similar, and those prongs look at whether there was a real business purpose or whether the transaction was solely for tax avoidance, and as the Court recognized in Southgate, those do relate. And they both, I think, are shown to have been met here by that expert report I read earlier that states that this was not about business investments, that this didn't relate to Mr. Tucker's business investments, but rather that their timing and their planning was all for tax purposes. Moreover, the record as a whole is just replete with evidence about his correspondence with KPMG where he's looking for some mechanism to offset his income from his stock options and looking for some tax solution. And ultimately, when he entered into the transaction, he followed KPMG's, what they called the CFC timeline, which is attached to a memo at page 4253 through 4262 of the record that lays out the timing of the transaction, and he timed his sales and purchases and all of his steps of reorganizing and electing partnership status for his controlled foreign corporation all within the guidelines that KPMG laid out in order to get the tax benefits. He didn't exercise his own financial expertise, which was considerable, to make a decision based on what made sense from a profit perspective. So I think those facts amply support the tax court's holding that the subjective prongs of showing a non-tax business purpose and whether the transaction was for tax avoidance indicate also that this transaction lacked economic substance. The taxpayer points to the Summa Holdings case and in its brief also to Wisconsin Central and Benenson as cases that have emphasized the importance of the statutory language in the tax code, but I think all those cases are distinguishable. Wisconsin Central is the only controlling case, and it has nothing to do with the economic substance doctrine. It was an employment tax case that dealt with whether railroad retirement tax applied to stock benefits, and it was interpreting the definition of compensation in that statute as any form of money remuneration and trying to determine whether the word money was a limiting term. So it was a plain statutory construction case dealing with very real payments for real services rendered, and it was, again, an employment tax, not an income tax case. So it really has no bearing at all on this case. The Summa case and Benenson case involved the exact same transaction, and I think the First Circuit dealing with the exact same transaction followed the Sixth Circuit, but that case is readily distinguishable and doesn't bind this Court. First of all, neither of those cases purported to overrule, and because they were panel decisions, couldn't overrule prior decisions of both those circuits that have recognized the economic substance doctrine applies when you have an artificial wash transaction in a situation, even if it's formally co-compliant. And I would point the Court to the Dow Chemical case in the Sixth Circuit and the Santaner case in the First Circuit that both applied the economic substance doctrine fairly recently. In Summa, it was a — the Court applied a distinct doctrine, the substance of reform doctrine, which is an entirely different doctrine, as the Tenth Circuit explained in Rogers, that deals with a situation where the parties have engaged in a real transaction, money really changed hands, or property really was exchanged that wasn't a wash, but what happened was that the commissioner looked at it and said what they've claimed as the tax results is something different from what really happened. And that very different doctrine was at issue in Summa, and Summa also involved a very unique situation in that the — one of the entities used in that transaction where they shifted money from an operating company to Roth IRAs owned by shareholder family members was they used something called a domestic international sales corporation, which is something that Congress created as a unique type of entity that can lack economic substance. It can be basically a shell and transfers of money can be made from an operating company to its related domestic international sales corporation without any arm's length exchange. And it was designed as an export — as an incentive for domestic companies to have export sales. And that unique entity made it so that in Summa and in Benenson the economic substance doctrine couldn't possibly apply. And that's a really unique situation where Congress has spelled out an exception to economic substance that's very different from its general provisions like the corporate reorganization provisions at issue in Gregory v. Halvering or the check the box provisions here that are meant to deal with real transactions and have no express carve out from the general rules about arm's length transactions between related parties or the economic substance doctrine. So I think Summa and Benenson are very distinguishable and in no way should be viewed by this Court as altering its precedent under the economic substance doctrine, which is consistent with the economic substance case law in the First and the Sixth Circuit as well as in most other circuits and consistent with the Supreme Court's opinion in Gregory v. Halvering, which hasn't been disturbed. If there are no further questions, I'll rest on our briefs from there. Thank you, Counsel. Rebuttal. Thank you, Your Honor. There's two questions here. One is at what level do you apply this economic substance doctrine? The government's position, and I will give them, that is supported by some of the case law, is that you literally apply it without looking at the statutes. Imagine a world, this is what we do, imagine a world in which the Code said, X is the answer even if you don't have economic substance. Under the government's reading and some of the cases, you wouldn't even know that because you would never get inside the little world of the tax law. You would look out here and determine whether the transaction even is respected such that the judiciary should apply the rules of the law to it. That, we argue, is inappropriate. It's inappropriate from a statutory construction perspective. It's inappropriate from a separation of powers perspective. The Court should not be doing that. Now, when we look to SUMA, my colleague wants to distinguish SUMA by saying, well, in DISC, Congress was not worried about economic substance. If you read those DISC rules, they don't say economic substance doesn't apply. They don't say we don't care about economic substance. They just have literal mechanical rules. And we have literal mechanical rules here, too, like a rule that literally says if something happens within 30 days, it doesn't matter. Another rule that says a taxpayer gets to pick between two different gain amounts. It's the same. There's no analytical difference between those two things. Finally, I would say, the tax motivation, there's a lot that gets thrown at Mr. Tucker in this with respect to tax motivation. The courts have been clear that tax motivation does not matter. I mean, Gitlitz, the Supreme Court, has said because the Code's plain text permits the taxpayers here to receive these benefits, we need not address this policy concern, the policy concern being that taxpayers would experience a double windfall pursuant to the government. You have to look past the noise of motivation and things like that and look to what the statutes actually say. And if you do, you would reverse the tax court. Thank you, Your Honor. Thank you.